DOMENGEAUX, Judge.
This suit arose from an auto accident between two automobiles, one driven by the plaintiff, Clarisse Defils, and the other, a taxicab, driven by defendant, Robert J. Martin, owned by defendant Jules Reed, and insured by defendant, Protective Casualty Insurance Company. The plaintiff sued individually for the injuries she sustained and, in her capacity as tutrix of her minor child, Brandy Nicole Lavergne, sued for the child’s loss of consortium. After ruling in favor of the plaintiff and awarding $7,563.43 in total damages, including $5,000.00 in general damages, the Trial Court found the plaintiff to be 10% contrib-utorily negligent and reduced the total award by this amount. The Court also awarded $100.00 for the child’s loss of consortium.
The plaintiff has appealed as manifest error both the $5,000.00 award in general damages and the $100.00 award for the child’s loss of consortium. She has also appealed the Trial Court’s determination that she was 10% contributorily negligent in causing the accident.
FACTS
On December 11, 1984, around 7:30 a.m. in the City of Opelousas, the plaintiff was driving east along Bellevue Street en route to work. A heavy morning fog had fallen. As she approached the intersection of *725 Bellevue and Virginia Streets, she testified that her lights were on and she was travel-ling at a speed of approximately 20 mph.
A taxicab driven by defendant James Martin, driving north along Virginia Street, stopped at the intersection of Virginia and Bellevue Streets. The cab intended to turn left onto Bellevue Street but, due to the angle of the intersection, the cars parked along Bellevue Street partially obstructed its view. Apparently seeing no approaching vehicles, the cab proceeded to turn left onto Bellevue Street but was hit in the left front panel by the plaintiff’s vehicle. The cab driver testified that the plaintiff did not have her lights on and that he believed that she was traveling faster than the 20 mph speed limit.
Upon impact, the plaintiff’s head struck the windshield and her chest hit the steering wheel. She was not wearing a seat-belt. After being taken to Opelousas General Hospital, she was examined by Dr. Calvin White and initially diagnosed as having a cervical myofascial strain, a closed head injury, bilateral shoulder contusions and multiple abrasions and/or contusions on the knees. In layman’s terms, Dr. White described the plaintiff’s injury as a mild to moderate whiplash. By the next day, the plaintiff’s cervical neck and chest muscles displayed an even more pronounced spasm. Dr. White prescribed heat therapy. By the third day, December 14, 1984, the plaintiff began to experience severe headaches and lower chest pain. Because the plaintiff soon thereafter began seeing her family physician, Dr. Milton Joli-vette, she asked to be discharged from Dr. White’s care in January, 1985.
At the trial, Dr. White stated that he had previously treated the plaintiff for injuries she sustained in another auto accident occurring in July, 1984. In that accident, the plaintiff sustained injuries that were very similar to the injuries she sustained in the December, 1984 accident. Dr. White testified that he felt that the plaintiff had completely recovered from the injuries of this earlier accident by October, 1984.
The plaintiff saw her family physician, Dr. Milton Jolivette, a week after the accident, on December 17, 1984. Dr. Joli-vette’s initial diagnosis of the plaintiff’s condition was similar to Dr. White’s diagnosis; primarily cervical muscle strain. The plaintiff continued to see Dr. Jolivette regarding this strain once a month until August, 1985. Throughout these eight months, the plaintiff continued to exhibit objective findings of muscle strain and tension in the cervical muscle group.
The plaintiff discontinued seeing Dr. Joli-vette for one year, from September, 1985, until September, 1986. When the plaintiff was examined in September, 1986, she was still complaining of headaches and muscle strain. At this point Dr. Jolivette suspected that the plaintiff’s chronic condition was due to cervical facet joint syndrome. Dr. Jolivette described this condition as “episodic”, such that a facet joint slips in and out of alignment. He further explained that the condition was detectable only when the facet joint was misaligned. Upon examination of the plaintiff in February, 1987, Dr. Jolivette felt a slight dislocation in the third cervical facet joint, confirming his earlier diagnosis. Dr. Jolivette stated that the syndrome could be caused by either trauma or by an extended period of strain on the cervical muscle region and that the plaintiff’s condition resulted from the latter.
Facet joint syndrome was described as a degenerating condition caused by spasms resulting in pain which continues the spasms. Eventually the protein in the muscle tissue becomes depleted and the entire region begins to deteoriate. Dr. Joli-vette stated that it was more probable than not that the plaintiff’s chronic muscle tension from the auto accident of December, 1984, caused the plaintiff’s cervical facet joint syndrome and her chronic migraine headaches.
Additionally, in her capacity as tutrix for her daughter, Brandy Nicole Lavergne, the plaintiff sued the defendants for the loss of consortium her seven year old daughter suffered due to the plaintiff’s inability to care for her for an eight month period after the accident. The plaintiff’s sister, Briget Andrea Defils, testified that she *726 cared for Brandy one to three times a week after school for eight months because the plaintiff’s severe headaches prevented her from caring for the child. The plaintiff testified that her daughter became “obnoxious” because she was denied her mother’s love, affection and attention. After the plaintiff’s sister moved to Baton Rouge to attend college, the plaintiff’s mother helped babysit the child. However, the plaintiff testified that her relatives helped babysit and care for the child before the accident, but not necessarily to the extent that they did after the accident.
The Trial Court ruled in favor of the plaintiff and awarded her general damages of $5,000.00; reimbursement for car rental expenses of $1,370.43; medical expenses for Drs. White and Jolivette of $390.00; medical expenses for the plaintiff’s physical therapist of $591.00 and lost wages of $212.00, for a total judgment of $7,563.43. Also, the Trial Court awarded $100.00 for the daughter’s loss of consortium.
The plaintiff has appealed the quantum of both her and her daughter’s damage award. She has also appealed the Trial Court’s determination that she was 10% contributorily negligent.
QUANTUM
The plaintiff contends that the Trial Court’s award of $5,000.00 in general damages for the plaintiff’s injuries is so low as to constitute an abuse of discretion. In support of her claim the plaintiff has cited numerous cases in which plaintiffs with similar neck and shoulder injuries were awarded far greater general damage awards.
The standard of appellate review of a Trial Court’s quantum award is well established: before the Court of Appeal can disturb a quantum award made by the Trial Court, the record must clearly reveal that the trier of fact abused its discretion in making its award; only after making a finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award and then only to the extent of lowering it or raising it to the highest or lowest point which is reasonably within the discretion afforded that court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). In determining whether the Trial Court has abused its discretion in determining the amount of the award, the appellate court must look first, not to prior awards, but to individual circumstances of the case before it. Only after such a determination of abuse of discretion has been reached is a resort to prior awards appropriate for purposes of determining what would be an appropriate award. Reck v. Stevens, 373 So.2d 498 (La.1979).
The plaintiff’s damages consisted of neck and shoulder pain with objective muscle spasms still visible to her physician even two years after the accident. These muscle spasms caused severe headaches and their chronic state eventually resulted in the dislocation of a cervical facet joint, thereby causing the plaintiff additional pain and suffering. Testimony by the plaintiff and her former co-workers indicated that because these headaches and muscle spasms prevented the plaintiff from sitting with her head down for an extended period of time, she was less productive at work and eventually had to drop her enrollment in several night courses at the University of Southwestern Louisiana. As a divorced single mother, these extended consequences of her injuries caused her additional stress and anxiety, also aggravating her physical condition. At the time of trial, the plaintiff had changed job positions and was now working with computers and had also enrolled as a full-time college student. She was still in pain as of the date of the trial.
The Trial Judge rendered no reasons for judgment which would have outlined his factual findings and credibility determinations. By ruling in the plaintiff’s favor, the Trial Judge apparently generally agreed with her version of the accident and her resulting damages. In light of the uncontroverted medical testimony regarding the duration and severity of the plaintiff’s injuries, $5,000.00 for the plaintiff’s general damages appears manifestly low. A review of prior awards in the jurispru *727 dence for similar injuries indicates that the lowest possible award reasonably within the Trial Court’s discretion for such an injury was $7,500.00.
Additionally, the plaintiff has appealed the award of $100.00 for her daughter’s loss of consortium as so low as to constitute an abuse of the Trial Court’s discretion. The uncontroverted evidence indicated that the plaintiff’s sister cared for the child one to three times per week after work. This lasted for eight months after the accident, at which time the sister moved to Baton Rouge and the plaintiff’s mother assumed the babysitting responsibilities. The plaintiff claimed that her daughter’s personality became obnoxious during this time because she preferred care by the plaintiff, rather than the care given by her aunt and grandmother. However, the plaintiff’s testimony at trial indicated that the child had been receiving care similar in kind and amount by her relatives before the accident when the plaintiff had attended night classes. The Trial Court apparently felt the child’s loss was minimal and awarded only $100.00 for her damages.
The term “loss of consortium” includes the loss of three items: sex, services and society. Of these three, the plaintiff presented evidence of only loss of society through evidence that other relatives cared for her child. The extent of her daughter’s loss was undermined by the plaintiff’s own admission that the relatives provided similar care before the accident. Due to this admission, we find no abuse of discretion in the Trial Court’s award of only $100.00 for the daughter’s loss of her mother’s society for the eight month period following the accident.
ALLOCATION OF FAULT
The plaintiff also contends that the Trial Court erred in determining that she was 10% contributorily negligent in causing the accident. The appellate court will hot disturb the factual findings as to determination and apportionment of fault unless, for articulated reasons, such findings are found to be clearly erroneous. Collins v. Sonnier, 488 So.2d 471 (La.App. 3rd Cir.1986).
At the trial, conflicting evidence was presented as to whether the plaintiff was traveling the speed limit and as to whether she had her lights on while traveling in heavy fog. As stated earlier, without written reasons, we do not know what factual findings were made by the Trial Judge. However, based on this evidence, assuming the Trial Judge determined that the plaintiff had exceeded the speed limit or had not had her lights on or both, it does not appear that the Trial Court committed manifest error in allocating 10% of the fault of the accident to the plaintiff. The allocation of fault is thereby affirmed.
For the foregoing reasons, the ruling of the Trial Court is modified to increase the general damage award to the plaintiff from $5,000.00 to $7,500.00. The decision of the Trial Court is otherwise affirmed.
Costs on appeal are assessed against defendants.
AFFIRMED AS AMENDED.